**In the Interest of J.D.F., A Minor Child, J.D.F., Appellant.**

No. 95–1545.

Supreme Court of Iowa.

Sept. 18, 1996.

Frank Steinbach III of Cook, Gotsdiner, McEnroe & McCarthy, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Diane Stahle, Special Assistant Attorney General, and Maureen McGuire, Assistant Attorney General, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

This appeal arises from the district court's denial of defendant's motion to suppress evidence. The evidence was obtained by police officers from defendant, a juvenile, while in custody. We affirm.

## I. Factual and Procedural Background

On November 21, 1994, a call came over the police radio that a juvenile had been seen carrying a weapon and was attempting to put an ammunition clip into it. Sergeant William Judkins responded to the call and approached defendant JDF, who was standing on the street corner and met the description sent over the radio. Judkins observed what he thought to be a gun sticking out the front of JDF's pants. Judkins stopped his vehicle, identified himself as a police officer, and asked the defendant if he was carrying a gun. JDF did not respond, but instead turned and fled. Judkins pursued him on foot through a residential neighborhood, but eventually was outdistanced and lost sight of him. Judkins returned to his vehicle and gave a description of the suspect, including the detail that he believed the suspect was carrying a firearm, and the direction he had run. Judkins then drove around the neighborhood, spotted JDF, and apprehended him by wrestling him to the ground. At that time, the defendant did not possess a weapon.

Officers arrived on the scene, handcuffed JDF, and put him in the back of a squad car. JDF was neither arrested at this time nor read his *Miranda* rights. Sergeant Kail, a uniformed officer who answered Judkins' radio call for assistance, proceeded to question JDF about whether he had knowledge of a gun. JDF replied that he did not. Kail indicated he was concerned that persons in the neighborhood would come across the weapon and hurt themselves or others. JDF continued to deny he had a gun and instead led the officers to a crack pipe he had dropped during the chase. Kail continued to question JDF about the gun and eventually told him that if he showed them its location, he would not take him into custody at juvenile hall nor would he file charges against him. After this promise, JDF led the officers to a loaded automatic pistol, which was hidden under a tree in a residential back yard.

Kail then took JDF home and being unable to locate his parents, released him to the custody of his uncle. The next day the county attorney filed a delinquency charge against JDF, charging him with carrying a concealed weapon. JDF filed a motion to suppress his statements concerning the gun and the gun as physical evidence. This motion was denied by the juvenile court. JDF was subsequently adjudicated as having committed a delinquent act. It is from this adjudication that JDF appeals.

## II. Standard of Review

Juvenile delinquency proceedings are not criminal prosecutions, but are special proceedings that serve as an ameliorative alternative to the criminal prosecution of children. *In re J.D.S.*, 436 N.W.2d 342, 344 (Iowa 1989). Juvenile proceedings are reviewed de novo. *In re A.M.H.*, 516 N.W.2d 867, 870 (Iowa 1994). Questions of both law and fact are subject to review. *In re D.L.C.*, 464 N.W.2d 881, 882 (Iowa 1991). Weight should be given to the fact findings of the juvenile court, especially when considering the credibility of witnesses, but the reviewing court is not bound by them. Iowa R.App.P. 14(f)(7); *J.D.S.*, 436 N.W.2d at 343.

## III. Issues on Appeal

### A. Interrogation

JDF first contends that all his statements to the police, including those regarding the possession and location of the

gun, should be suppressed because the questioning occurred outside the presence of his parents and attorney and that he was not properly Mirandized before the interrogation. Generally, before initiating custodial interrogation, police must advise suspects of their *Miranda* rights in order to safeguard their Fifth Amendment privilege against the inherently coercive effect of such questioning. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 726 (1966). Being handcuffed and placed in the police car by the police officers, JDF was clearly in custody. "The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275, 1279 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam)). As such, the first issue in the instant case is whether the police officers were justified in questioning JDF about the location of the gun prior to Mirandizing him and contacting his parents.

■ The United States Supreme Court has recognized a public safety exception to the requirements of *Miranda*. In *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Court established an exception to the general requirement that a suspect be advised of his rights before interrogation in narrow circumstances where "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self incrimination." *Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. Such circumstances generally involve a gun that has been left in a public area and the officers believe that it poses a danger to the public if left unfound. If this is the case, the officers are justified in questioning a suspect about its location without adhering to the requirements of *Miranda*. *Id*. "In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding." *Id*.

■ The public safety exception has also been considered in juvenile proceedings, using the same rationale as that used in criminal cases. *See In re B.R.*, 133 Ill.App.3d 946, 89 Ill.Dec. 78, 479 N.E.2d 1084 (1985); *State ex rel. A.S.*, 227 N.J.Super. 541, 548 A.2d 202 (1988); *In re John C.*, 130 A.D.2d 246, 519 N.Y.S.2d 223 (N.Y.App.Div.1987). Our court has previously discussed the general applicability of the public safety exception and we stressed that the officer's conduct in seeking the location of the weapon must fall within the limited purpose of protecting the public. *See State v. Deases*, 518 N.W.2d 784, 791 (Iowa 1994). Thus, the interrogation must not occur for the purpose of building a case against the suspect and there must be a sufficient exigency to justify the questioning.

■ The facts in this situation fall within the narrow scope of the exception as defined in *Quarles*. The officers on the scene had good reason to believe that a loaded weapon had been dropped somewhere in a residential neighborhood. The chances of someone coming upon the weapon were good and the officers took appropriate action to secure the area. Because JDF was seen with what appeared to be a gun in his possession, he was the logical target of questioning in an attempt to locate it. In fact, the officers even promised to take him home if he showed them its location—a promise they kept. As in *Quarles*, the officer "needed an answer to his question not simply to make his case against [the defendant] but to ensure that further danger to the public did not result from the concealment of the gun in a public area." *Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. Thus, the failure to Mirandize the defendant in *Quarles* was justified under these circumstances.

■ JDF correctly asserts that "painstaking care must be taken to obtain parental consent before questioning a juvenile." *State v. Walker*, 352 N.W.2d 239, 243 (Iowa 1984). Although there is no indication that the officers involved sought parental consent before questioning JDF about the location of the gun, we nevertheless believe such interrogation was proper. The requirement that

"painstaking care" must be exercised when interrogating a juvenile suspect does not exist in a vacuum. We recognize the need to deviate from this general rule in order to protect against exigent threats to the public.

 The danger sought to be alleviated by allowing the police to question a suspect before Mirandizing him stems from the fact that a loaded gun was abandoned in the area; it is not dependent on any characteristic of a particular suspect. The exigency is the same whether the suspect is an adult or a juvenile—a loaded gun left in a residential area is a genuine threat to the public safety regardless of who left it there. It would be unreasonable to require police to locate a suspect's parents and bring them to the scene while a loaded gun lay somewhere in the area. The exigency of the public safety concern necessitated that JDF be questioned before he was Mirandized and before his parents could be contacted. Accordingly, neither his statements nor the gun need be suppressed on these grounds.

## B. Involuntary Confession

 Although the interrogation of JDF is proper from the perspective of the exigent circumstances, he also asserts his inculpatory statements should be suppressed under other constitutional grounds. Specifically, JDF cites his Fifth Amendment right to not be coerced into making involuntary, inculpatory statements. As this court has stated, "[t]he test for determining the admissibility of confessions or inculpatory statements is voluntariness." *State v. Munro*, 295 N.W.2d 437, 440 (Iowa 1980) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961)). In determining whether a particular statement is voluntary and thus admissible against a defendant, we employ a rigid standard that employs the totality of the circumstances:

> In order to establish the voluntariness of a defendant's inculpatory statements, the State must demonstrate from the totality of the circumstances that the statements were the product of an essentially free and unconstrained choice, made by the defendant at a time when his will was not overborne nor his capacity for self-determination critically impaired.

*State v. Cullison*, 227 N.W.2d 121, 127 (Iowa 1975); *see also State v. Smith*, 546 N.W.2d 916, 926 (Iowa 1996).

 This court is steadfast in its holding that any communication made by police that gives the slightest indication of leniency in exchange for the defendant making inculpatory statements renders such statements inadmissible. "[A] confession wrung from the flattery of hope, or by the torture of fear, comes in such questionable shape as to merit no consideration." *State v. Mullin*, 249 Iowa 10, 12, 85 N.W.2d 598, 600 (1957). Specifically, we have recognized that "[i]f the statement is not the product of 'rational intellect and free will,' but results from a promise of help or leniency by a person in authority it is not considered voluntary and is not admissible." *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982); *see also Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747, 759 (1970). We have previously held confessions obtained through a promise of leniency by a police officer are involuntary. *See State v. Whitsel*, 339 N.W.2d 149, 153 (Iowa 1983); *State v. Hilpipre*, 242 N.W.2d 306, 310–11 (Iowa 1976). Use of any inculpatory statement or confession obtained via police coercion as evidence against a criminal defendant is strictly forbidden. *State v. Ware*, 205 N.W.2d 700, 703 (Iowa 1973); *see also Payne v. Arkansas*, 356 U.S. 560, 561, 78 S.Ct. 844, 847, 2 L.Ed.2d 975, 977 (1958).

 This appears to be a clear case where JDF's inculpatory admission was induced by the police promising they would take him home rather than to the juvenile intake center. Although the police apparently acted in good faith and did, in fact, return him home, their promised leniency prejudiced JDF, especially in light of his age. Defendant had previously denied having knowledge of the gun until Sergeant Kail promised he would not be taken to juvenile hall. The record supports JDF's assertion that his statement to the officers was not a product of free will, but was a manifestation of his desire to avoid being processed by the juvenile system. The fact that it was the county attorney who later filed charges does

not overcome the strong policy that such promises should render any statements or confessions inadmissible. Thus, the inculpatory statements and the act of leading the police to the gun cannot be used as evidence against JDF.

In addition, the public safety exception as established in *Quarles* does not allow police to obtain involuntary or coerced statements under the auspices of exigent circumstances. "The Court has not extrapolated from [*Quarles*] that officers can compel self-incriminating statements.... While informing the accused of his rights is not a constitutional mandate, preventing coerced self-incriminating statements clearly is." *United States v. DeSantis,* 870 F.2d 536, 540 (9th Cir.1989) *(citing Quarles,* 467 U.S. at 654, 104 S.Ct. at 2630, 81 L.Ed.2d at 555); *see also United States v. Mobley,* 40 F.3d 688, 692 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2005, 131 L.Ed.2d 1005 (1995). Thus, although the public safety exception justifies the police in failing to Mirandize JDF and not contacting his parents before he was questioned about the gun, it does not make admissible evidence that was involuntarily given.

### C. Fruit of the Poisonous Tree/Inevitable Discovery

Although JDF's statements and his actions in showing the officers the location of the gun must be suppressed, sufficient evidence still exists, however, to adjudicate him delinquent for carrying a concealed weapon. Appellant urges us to apply the "fruit of the poisonous tree" doctrine to these facts and find that the gun is derivative evidence from the improperly obtained admission. We recognize that the exclusionary rule applies not only to illegally obtained evidence, but also to any incriminating evidence derived from the primary evidence, including that which stems from unlawful police conduct. *See Wong Sun v. United States,* 371 U.S. 471, 482–83, 83 S.Ct. 407, 414–15, 9 L.Ed.2d 441, 452 (1963); *State v. Ahart,* 324 N.W.2d 317, 318 (Iowa 1982). This analysis has also been specifically extended to violations of the Fifth and Sixth Amendments, as JDF asserts in this case. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The purpose behind the poisonous tree doctrine is to deter police conduct that focuses upon obtaining incriminating evidence against a suspect without regard to his constitutional or statutory rights. *Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 386–87 (1984). Courts recognize that this goal of deterrence may be attached to a social cost of letting persons go unpunished for their crimes. *Id.* This does not appear to be a case, however, where the officers' motivation was to obtain incriminating information from JDF. Rather, the record indicates their primary goal was to secure the weapon that might injure someone who found it. The radio call indicated the suspect was attempting to place an ammunition clip into the weapon which was later known to be abandoned in a residential yard. Furthermore, the officers followed through with their assurance to JDF that they would take him home and not place him into juvenile intake. He was released to the custody of his uncle and it was not until the next day that the county attorney chose to file delinquency charges against him. These facts give credibility to the officers' assertion that their primary concern was the safety of the public.

In addition, the record provides evidence that the gun most likely would have been found irrespective of whether JDF led the officers to it. This court has recognized that impermissibly obtained evidence which would have inevitably been discovered is still admissible. "When the State can establish by a preponderance of the evidence that a specific piece of evidence ultimately or inevitably would have been discovered by lawful means, the exclusionary rule does not apply and the evidence should be admitted." *State v. Vincik,* 436 N.W.2d 350, 354 (Iowa 1989) (citing *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509, 81 L.Ed.2d at 387).

The testimony of the arresting officers indicates a search party had been formed to find the gun while JDF was being questioned. Sergeant Judkins indicated the gun was ultimately found "underneath a small pile of brush that [JDF] had laid on top

of it." Sergeant Kail testified it was located "under some pine trees in a residential area back yard." Even the testimony of JDF suggests it was not well hidden or buried. JDF testified that after Judkins confronted him, he started running and while he was running he "dropped the gun because ... it was tucked into my pants." There is no testimony that JDF stopped and made an effort to effectively conceal the weapon in the ground. Although it probably would not have occurred as quickly, the record proves by a preponderance of the evidence that the gun would have inevitably been discovered without JDF's assistance.

Finding the gun is only one piece of evidence that would support an adjudication of delinquency. An experienced sergeant, after hearing a call that a juvenile had a loaded weapon, spotted JDF who matched the suspect's description. He also observed what he believed to be the butt of a gun protruding from JDF's pants. When confronted by the officer's question if he had a gun in his possession, JDF ran. Thus, although JDF's incriminating statements regarding the location of the gun must be suppressed due to their involuntary nature, sufficient evidence still exists to adjudicate him delinquent.

IV. Conclusion

Although the public safety exception permits the police to question a juvenile prior to a reading of *Miranda* rights and outside the presence of his parents or attorney in narrowly drawn circumstances, the involuntary nature of JDF's confessions renders his inculpatory statements inadmissible. The record proves, however, that the gun would have inevitably been located and a strong circumstantial case exists to adjudicate JDF delinquent. The record also establishes that the admission by the juvenile that he did possess the gun and his leading the police officers to the gun were not the basis for the delinquency adjudication by the juvenile court. We agree and under our de novo review the juvenile delinquency adjudication is affirmed.

**AFFIRMED.**