# IN THE SUPREME COURT OF IOWA

No. 23–0858

Submitted February 19, 2024—Filed March 29, 2024

**STATE OF IOWA,**

    Appellant,

vs.

**FARON ALAN STARR,**

    Appellee.

---

Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.

The State appeals a district court order granting a motion to suppress due to failure to honor a defendant's request to call a family member following arrest and arrival at the police station. **AFFIRMED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General, and Thomas J. Ogden (argued) and Thomas E. Bakke, Assistant Attorneys General, for appellant.

Lucas M. Taylor (argued) of Anderson & Taylor, PLLC, Des Moines, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Iowa law requires that a person who is arrested be permitted to call and consult a family member or an attorney (or both) "without unnecessary delay after arrival at the place of detention." Iowa Code § 804.20 (2022). In this case, we are called on to decide whether a police officer could refuse an arrested person's request to call his father in order to obtain an attorney and instead question the arrested person. The State argues that the officer did not delay "unreasonably" because there was a paramount safety issue: the arrested person had fled a crime scene the day before and was suspected of having burglarized two long guns in the course of his flight; when arrested, he did not have the guns on him.

We do not foreclose the possibility that public safety concerns *can* justify a delay in honoring an arrested person's invocation of Iowa section 804.20, but we conclude that the circumstances here *did not*. Therefore, we affirm the district court's order granting the defendant's motion to suppress.

### II. Facts and Procedural History.

On the morning of November 7, 2022, M.N. ran into a convenience store in Sioux City, yelling that her boyfriend, Faron Starr, had just assaulted her. Starr was holding a knife as he ran up to the store behind her. M.N. had a stab wound in her leg. By the time law enforcement responded to the call from the store, Starr had fled the scene. M.N. was taken to the hospital.

Within a few minutes, a report came in of a burglary at a house within a block or two of the convenience store. The house was located in the same direction Starr had fled. The homeowner reported that an AR-15, a shotgun, and ammunition were missing. Police suspected that Starr had committed the

burglary. They ordered that two nearby schools and the hospital be placed on lockdown and continued to try to locate Starr.

The following day, November 8, the lockdowns were lifted even though Starr had not yet been found. Starr was eventually arrested at around 3:30 p.m. outside the hospital where M.N. had gone for treatment. At that time, Starr also had an outstanding warrant for a parole violation. But he did not have the knife or guns in his possession.

The police took Starr to the Sioux City Police Department and called in Detective Grimsley to question him. Detective Grimsley took about forty-five minutes to arrive at the station and enter the interview room. He asked Starr a few questions. After a couple of minutes, he read Starr his *Miranda* rights and asked him to sign an acknowledgment.

Starr equivocated. Initially he said, "I don't really care to talk to anybody." He added, "I've been trying to talk to people for a long time." But then a few moments later, Starr said, "I really do want to talk to you." Starr started answering Detective Grimsley's questions and interjected that he would sign the acknowledgment. After another minute of questions and answers, Detective Grimsley reminded Starr of his need to sign the acknowledgment:

> [L]ike I said, I've got to get acknowledgment from you that you're willing to talk to me. If you sign that it doesn't mean you have to sit here and talk to me for three hours. You can stop at any time.

Detective Grimsley filled out the acknowledgment with Starr's name and handed it to Starr. The discussion then proceeded as follows:

> Detective Grimsley: Okay. Just right there. We can talk a little further.
>
> Starr: I just really don't see how that would help anything.
>
> Detective Grimsley: How about that if you're willing to sign it and listen, I can talk to you a little bit?

Starr: I just wish we can just get to the point.

Detective Grimsley: That's what I want to do.

Starr: Because we're not legally -- we're not --

Detective Grimsley: What's that?

Starr: In other words, if I don't touch this thing, then we're not legally allowed to talk or something?

Detective Grimsley: Exactly, yeah.

Starr: Then why don't I just call my father and have him get a lawyer and we can sign this paper and we can talk?

Detective Grimsley: Well, that's the thing. That wouldn't happen today.

Starr: Nothing.

Detective Grimsley: But I want to talk to you today, right now.

Starr: I just don't even, I don't know if that's a good decision or not.

Detective Grimsley: Yeah.

Starr: Like I just said, it's not you as a person. Nothing like that. I don't --

Detective Grimsley: I understand.

Starr: -- know what the hell is going on.

Detective Grimsley: Yeah. And we can't obviously give you advice or anything like that.

Starr never did sign the acknowledgment of his *Miranda* rights. However, the interview between Starr and Detective Grimsley continued. About thirty-five minutes later, Starr admitted stabbing M.N. with the knife. He implied that he had dropped the knife while running away. After another fifteen minutes or so, Detective Grimsley raised the subject of the missing guns:

Detective Grimsley: One thing I am concerned about is a couple guns that got taken yesterday.

Starr: Okay.

Detective Grimsley: I don't want those guns on the street anymore.

Starr: Okay.

Detective Grimsley: Do you know where those guns are?

Starr: You want me to get rid of them?

Detective Grimsley: I want them off the street, yeah.

Starr: You want to get rid of them?

Detective Grimsley: I want to get them off the street. Yeah.

Starr: Well, let's go get them.

After additional back-and-forth, the police agreed to Starr's proposal that he would personally lead them to the house and the individual with whom he had left the guns. The guns were retrieved, and the parties returned to the police station. Detective Grimsley's questioning resumed and became more specific about the events of the previous day. Starr admitted to more details about the stabbing and the burglary of the guns.

Toward the end of this questioning, over two hours after Starr's initial request to contact his father, Starr asked again to call his father. Starr also said he wanted to apologize to M.N. Detective Grimsley said he could not let Starr call M.N. but offered him the opportunity to call his father. Detective Grimsley volunteered to bring a phone. He asked Starr if he knew his father's number; Starr shook his head. There was a phone book sitting on the desk in front of Starr. The discussion moved elsewhere and ended soon thereafter.

On November 16, a trial information was filed in the Woodbury County District Court charging Starr with willful injury as a habitual offender in violation of Iowa Code sections 708.4(2) and 902.8, second-degree burglary in violation of Iowa Code sections 713.1 and 713.5(1), going armed with intent as a habitual

offender in violation of Iowa Code sections 708.8 and 902.8, domestic abuse assault third offense as a habitual offender in violation of Iowa Code sections 708.2A(4) and 902.8, and two counts being a felon in possession of a firearm as a habitual offender in violation of Iowa Code sections 724.26(1) and 902.8.

Starr filed a motion to suppress his statements of November 8 and evidence developed therefrom. He asserted violations of his constitutional rights to remain silent under the United States and Iowa Constitutions and his statutory rights under Iowa Code section 804.20. The State responded that Starr had not unambiguously invoked his *Miranda* rights. The State also argued that a public safety exception to both *Miranda* and Iowa Code section 804.20 applied given the urgency of locating the stolen firearms and ammunition.

The district court held a hearing on the motion to suppress. Detective Grimsley was the only live witness, but the police station videos of Starr's questioning were also presented. On the matter of public safety, Detective Grimsley testified,

> The guns were probably -- definitely my top priority in this. They were unaccounted for. We didn't know where they could have gone. We didn't know if they were stashed somewhere. . . . [W]e were searching garages and alleys, dumpsters, yards for these firearms. . . . [L]ike I mentioned, this is a -- a rather large residential area.

Detective Grimsley added that his concern was,

> That anyone and everyone walking around could have -- could have picked them up and found them. Kids walking back and forth from school could have found them. And they're very, very dangerous weapons. So we didn't want that to happen.

The district court issued a ruling partly denying and partly granting the motion to suppress. The court found that Starr had not made an unambiguous invocation of his *Miranda* rights, so there was no constitutional violation:

This evidence does not demonstrate clearly that Starr intended to exercise his right to remain silent and refuse to answer questions from Detective Grimsley. Starr's response, when heard on the recording, clearly conveys a desire to speak with Grimsley, but with some hesitation and equivocation that appropriately prompted Grimsley to seek clarification. Grimsley's effort to clarify whether Starr would be willing to speak with him and thus waive his right to remain silent was reasonable and necessary in order for him to properly navigate the Constitutional safeguards provided to Starr by *Miranda* and to discern the level of Starr's willingness and desire to waive those protections.

Yet the district court concluded that Starr's rights under Iowa Code section 804.20 had been violated. The court noted that early in the interview, before any discussion of the guns or almost all the discussion of the assault on M.N., Starr asked to call his father. In the court's view, "Starr's statement [was] clear enough to invoke the provisions of Iowa Code Section 804.20."

The district court then addressed the State's argument that a public safety exception applied under section 804.20. The court rejected this argument, concluding as follows:

As of this point, no such exception has been recognized. It is likely that the Iowa Supreme Court would look favorably on such a suggestion under the proper circumstances, but it is the prerogative of the Iowa Supreme Court to carve out exceptions to statutes and constitutional provisions and not the District Court.

The court thus suppressed all evidence obtained after Detective Grimsley's denial early in the interview of Starr's request to call his father, when Detective Grimsley answered, "Well, that's the thing. That wouldn't happen today."

The State applied for interlocutory review of the district court's order suppressing evidence based on the violation of Iowa Code section 804.20. We granted the application and retained the appeal.

**III. Standard of Review.**

"Our review of the district court's ruling on the motion to suppress is for the correction of legal error because the basis for the motion is statutory." *State*

*v. Casper*, 951 N.W.2d 435, 437 (Iowa 2020). "If the district court applied the law correctly and substantial evidence supports the court's findings of fact, we will affirm the district court's ruling on a motion to suppress." *State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019).

**IV. Analysis.**

**A. Overview of Iowa Code Section 804.20.** We must decide whether the district court correctly applied Iowa Code section 804.20 in this case. That section, entitled "Communications by arrested persons," provides,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, *without unnecessary delay after arrival at the place of detention,* to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

Iowa Code § 804.20 (emphasis added). The State argues that the statute—by its terms—prohibits only "unnecessary delay" in honoring an arrestee's request to make a phone call to a family member. It contends that delay here was necessary because of the threat to public safety posed by the missing firearms. Starr maintains that there is no public safety exception to the rights afforded by section 804.20. And he adds that even if there were such an exception, it would not apply under the facts of this case.

Notably, the original version of what is now Iowa Code section 804.20 differed in some respects from the current version, which dates to the 1976 criminal Code revision. *See* 1976 Iowa Acts ch. 1245 (ch. 2), § 421 (codified at

Iowa Code § 804.20 (Supp. 1977)). As originally enacted in 1959, the statute read,

> Any peace officer or other person having custody of any person arrested or restrained of his liberty for any reason whatever, shall, before preliminary hearing and arraignment, except in cases of imminent danger of escape, permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of his or her family or an attorney of his or her choice. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If the person arrested or restrained is intoxicated, or a person under eighteen years of age, the call shall be made by the person having custody. An attorney shall be permitted to see and consult the person arrested or restrained alone and in private at the jail or other place of custody. . . . A violation of this section shall constitute a misdemeanor.

1959 Iowa Acts ch. 373, § 1 (codified at Iowa Code § 755.17 (1962)). Thus, the present-day version omits the exception for "cases of imminent danger of escape"; makes clear that the detainee can call, consult, or see both a family member *and* an attorney; indicates that a reasonable number of calls to secure an attorney shall be permitted; and makes clear that an attorney shall be permitted to see and consult confidentially with the detainee "without unreasonable delay." Iowa Code § 804.20.

Iowa Code section 804.20 applies to all persons who have been arrested, not just persons arrested on suspicion of drunk driving. *State v. Sewell*, 960 N.W.2d 640, 645 (Iowa 2021). "On its face Iowa Code section 804.20 is a statute of general application. There is no indication in the statute that it is only concerned with the implied consent doctrine or the administration of breath tests." *State v. Moorehead*, 699 N.W.2d 667, 674 (Iowa 2005). The first case in our court applying the original 1959 version of section 804.20 was a murder case. *See State v. Shephard*, 124 N.W.2d 712, 714, 718 (Iowa 1963).

We have said that a suspect's invocation of their right to communicate with a family member or attorney should be construed "liberally." *Davis*, 922 N.W.2d at 330–31 (quoting *State v. Lamoreux*, 875 N.W.2d 172, 177 (Iowa 2016)); *see also State v. Hellstern*, 856 N.W.2d 355, 361 (Iowa 2014). In *State v. Garrity*, we held that once a detainee asks to make a phone call to any person, the officer has an obligation to advise the detainee of the persons to whom calls can be made under the statute. 765 N.W.2d 592, 596–97 (Iowa 2009). In *State v. Hicks*, we held that once the statute is invoked by requesting a call to an appropriate person, "the detaining officer must direct the detainee to the phone and invite the detainee to place his call or obtain the phone number from the detainee and place the phone call himself." 791 N.W.2d 89, 97 (Iowa 2010). In *State v. Lyon*, we observed that "we have insisted that law enforcement officers not play games when faced with a request from a person in custody to communicate with the outside world after being arrested." 862 N.W.2d 391, 401 (Iowa 2015).

At the same time, we have recognized practical limits on this right of communication and consultation. *Davis*, 922 N.W.2d at 331 (stating that we also apply the statute "pragmatically"). One such limit is the two-hour time window for chemical testing when the individual has been arrested for operating while intoxicated. *See State v. Walker*, 804 N.W.2d 284, 290 (Iowa 2011) ("The time for consultation is, however, effectively limited by law enforcement's interest in obtaining the test within two hours . . . ."); *Garrity*, 765 N.W.2d at 595–96, 596 n.1 ("[T]he arrestee's right to prior consultation is limited to circumstances where it does not 'materially interfere' with the chemical test procedure."). But we have recognized other limits as well.

For example, in *State v. Bowers*, the defendant and his wife were suspects together in a case of sexual abuse. 661 N.W.2d 536, 539 (Iowa 2003). Both were taken to the fire department for questioning, but the defendant was only allowed

to speak briefly with his wife before he was questioned. *Id.* He argued that "the DCI agents unduly limited his right to consult with his wife at the fire station and thus denied him a right provided by Iowa Code section 804.20." *Id.* at 541. We held that "given the circumstances of the present case, section 804.20 was not violated." *Id.* at 542. We offered the following reasoning:

> We believe that the right of a person in custody to consult with a family member is considerably diluted when the family member is also in custody for criminal conduct carried on jointly with the interrogated subject. Under the circumstances that existed, we are satisfied that the brief exchange of words that was permitted was sufficient to satisfy the requirements of section 804.20.

*Id.*; *see also State v. Tubbs*, 690 N.W.2d 911, 914 (Iowa 2005) (finding no violation of section 804.20 when the defendant was denied the right to speak with his wife because of a no-contact order and didn't ask to talk to anyone else).

Likewise, in *State v. Lamoreux*, we determined that a defendant was not entitled to relief when he and his attorney were given a nonprivate, monitored consultation room at the jail but his attorney was aware of this fact and didn't ask for something different. 875 N.W.2d at 175–76, 180–81. We explained,

> Importantly, this case does not involve surreptitious recording of attorney-client conversations. Here, Lamoreux's attorney was aware that the video and audio recording systems were functional and that the audio could be switched off. Yet he did not turn the audio off, cover the camera, or request another room, although he had been known to turn off the microphone in the past. Additionally, the presence of the audio and camera monitoring would have been obvious to Lamoreux himself. Nothing in the record indicates that Lamoreux's attorney was not "permitted" to consult confidentially and in private with his client; rather, the attorney made a decision to go ahead and consult with his client without privacy. No violation of Iowa Code section 804.20 occurred in this situation.
>
> . . . Space is often limited in law enforcement facilities and, as here, rooms may be equipped with surveillance for general security reasons. It may be more practical, and safer, to have the monitoring in effect unless specifically deactivated rather than the other way around. Also, an attorney called to a police station or jail late at night to meet an unruly client whom he or she does not know may

> prefer *not* to be alone in a closed-off, unmonitored room. In addition, we are reluctant to interpret section 804.20 as granting relief from a set of circumstances that were clearly accepted at the time. Furthermore, it is reasonable to expect an attorney who sees a surveillance system in operation to ask that the surveillance be turned off or that a different room be provided. Normally, in our legal system, attorneys have to ask for things and are good at doing so; that is why clients are willing to pay them.

*Id.* at 180–81.

Lastly, we apply an exclusionary rule to remedy violations of section 804.20. *Davis*, 922 N.W.2d at 331 ("When section 804.20 is violated, exclusion of evidence is the appropriate remedy."); *Hicks*, 791 N.W.2d at 97 ("The remedy associated with a section 804.20 violation is the exclusion of evidence . . . ."); *Garrity*, 765 N.W.2d at 597 ("We apply the exclusionary rule to violations of Iowa Code section 804.20, whether it is a violation of the right to communicate with family or with an attorney. The exclusionary rule extends to the exclusion of breath tests, breath test refusals, and non-spontaneous statements obtained after unnecessary delay in allowing the person the statutory right to consult with an attorney or family member." (citation omitted)); *State v. Harris*, 741 N.W.2d 1, 10–11 (Iowa 2007) ("Harris's Fifth Amendment right to an attorney and his statutory right to contact a family member were violated. Both violations required suppression of the statements made by Harris after he requested an attorney and requested permission to call his brother.").

In *State v. Walker*, we described the exclusionary remedy as "mandated by more than a generation of our precedent," invoked the doctrine of stare decisis, and concluded that we saw "no reason to retreat from our precedent in this case today." 804 N.W.2d at 296. Therefore, we rejected an approach taken by the court of appeals that would have required the defendant to show prejudice from the denial of section 804.20 rights. *Id.* As we put it, "Prejudice is presumed upon a violation of section 804.20." *Id.*

**B. The Public Safety Exception to *Miranda*.** Notably, there is a narrow public safety exception to the requirement that *Miranda* warnings be given before the answers of a person in custody may be admitted into evidence. *See New York v. Quarles*, 467 U.S. 649, 653–56 (1984). In *New York v. Quarles*, a woman told officers she had just been raped by a man carrying a gun. *Id.* at 651–52. One of the officers pursued the man in a supermarket, caught up with him, and handcuffed and arrested him. *Id.* at 652. After discovering that the man was wearing a shoulder harness that was empty, the officer asked him where the gun was. *Id.* The man replied, "the gun is over there." *Id.* In holding that this answer was admissible despite the absence of a prior *Miranda* warning, the United States Supreme Court reasoned,

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657. The Court expressed the view that this exception was both "narrow" and "w[ould] not be difficult for police officers to apply." *Id.* at 658. As the Court explained with respect to the case before it,

> Officer Kraft asked only the question necessary to locate the missing gun before advising respondent of his rights. It was only after securing the loaded revolver and giving the warnings that he continued with investigatory questions about the ownership and place of purchase of the gun. The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.

*Id.* at 659. The Court also made clear that the public safety exception was based on an objective standard, not dependent on "the motivation of the individual officers involved." *Id.* at 655–56.

In *In re J.D.F.,* we applied *Quarles* to a case involving a juvenile. 553 N.W.2d 585, 588–89 (Iowa 1996). A report came over the police radio of a juvenile carrying a weapon and attempting to load ammunition into it. *Id.* at 587. A responding police officer saw a juvenile who matched the description and appeared to have a "gun sticking out the front of [his] pants." *Id.* The juvenile fled when the officer asked if he was carrying a gun. *Id.* After giving chase, the officer caught the juvenile, who did not possess a weapon at that point. *Id.* Another officer on the scene questioned the juvenile repeatedly about the gun without Mirandizing him, and the juvenile "led the officers to a . . . pistol, which was hidden under a tree in a residential back yard." *Id.* We held that the public safety exception to *Miranda* applied:

> The facts in this situation fall within the narrow scope of the exception as defined in *Quarles.* The officers on the scene had good reason to believe that a loaded weapon had been dropped somewhere in a residential neighborhood. The chances of someone coming upon the weapon were good and the officers took appropriate action to secure the area.

*Id.* at 588.

Our court has addressed the public safety exception in a number of cases. *E.g., State v. Lowe*, 812 N.W.2d 554, 578, 580–81 (Iowa 2012) (holding that the public safety exception did not apply when the defendant was Mirandized, he asked for an attorney, he was put in a squad car, and then several hours later, the officers sought to reinitiate questioning after discovering inactive components of a meth lab but no smell); *State v. Simmons*, 714 N.W.2d 264, 269, 275 (Iowa 2006) (deciding that the public safety exception applied when an officer entered a home that was a suspected meth lab, detected a strong odor of

anhydrous ammonia, pointed his gun at the defendant, and asked him if there was an active meth lab); *State v. Deases*, 518 N.W.2d 784, 786, 788–89, 791 (Iowa 1994) (rejecting the public safety exception where an inmate who had stabbed another inmate with a shank had already been handcuffed and Mirandized; prison officials had the shank, the inmate had repeatedly said he didn't want to talk, and questioning went beyond the "limited purpose" of finding out if there were other shanks).

Usually, the public safety exception applies to statements made at the place of arrest, rather than at the police station or the jail. *See, e.g., United States v. Ochoa*, 941 F.3d 1074, 1097–98 (11th Cir. 2019) (finding the exception applicable when the agent "asked questions he reasonably believed were necessary to secure the scene following Ochoa's arrest"); *People v. Allen*, 199 P.3d 33, 36 (Colo. App. 2007) ("[O]ur caselaw indicates that the public safety exception applies most readily in the context of immediate, on-scene investigations of crime . . . ." (citation omitted)); *State v. Campbell*, 347 So. 3d 653, 653–55 (La. 2020) (per curiam) (holding that the public safety exception applied when officers responded to a child's report of her father shooting her mother during a domestic disturbance and the officers handcuffed and immediately questioned the defendant outside as to what had happened); *Schwartz v. Wyoming*, 483 P.3d 861, 867 (Wyo. 2021) ("The public safety exception applies to Max's statements at the scene of the crime.").

But in a few cases, the doctrine has been applied even when the defendant has been taken into custody and moved elsewhere before the relevant questioning occurs. *See, e.g., Trice v. United States*, 662 A.2d 891, 893, 896 (D.C. 1995). In *Trice v. United States*, the victim reported that he had been shot by the defendant in an armed robbery. *Id.* at 892. Four days later, an officer arrested the defendant at his home pursuant to an arrest warrant. *Id.* Young children

were present. *Id.* After the defendant had been taken to the police station, he invoked his *Miranda* rights and said he would not answer questions without an attorney present. *Id.* at 893. The officer spent twenty minutes asking personal background questions anyway. *Id.* Then the detective said, "I'd like to know where the shotgun is. There are little kids in the house. I don't want anyone to get hurt." *Id.* At this point, the defendant responded, "It's okay. I gave it back to the person I borrowed it from." *Id.*

The District of Columbia Court of Appeals concluded that the public safety exception applied to the defendant's statement:

> The fact that four days had passed before Detective Trugman asked appellant about the gun does not, in itself, make the public safety exception inapplicable. The passage of considerable time between the crime and police questioning about the location of a missing weapon might render the exception inapplicable if, for example, it would be unreasonable under the circumstances to believe, objectively, that the police questions were prompted by a concern for public safety, rather than by the need for factual investigation. In this case, however, the detective did not learn of the specific threat his question was designed to eliminate—danger to children—until he saw children in appellant's home at the time of arrest, four days after the shooting. On the facts here, therefore, the passage of four days between crime and questioning had no bearing on the later perception of danger and thus did not render the public safety exception inapplicable.

> Similarly, the fact that Detective Trugman waited more than an hour after observing the children at appellant's home before asking appellant about the gun does not require us to conclude that his question was designed to elicit incriminating evidence rather than to protect the children. . . .

> . . .

> As indicated earlier, however, we do not suggest that the exception remains available indefinitely simply because a missing weapon has not been located; if the police, after becoming aware of a threat to public safety, delay questioning the suspect about that threat for an unreasonable period of time, a court no longer may be able to conclude that the question was prompted by a concern for public safety rather than for factual investigation. This case, however, has not reached that outer limit.

*Id.* at 896–97.

In *United States v. Ferguson*, the United States Court of Appeals for the Second Circuit upheld an application of the public safety exception to questioning that occurred after the defendant's arrival at the police station. 702 F.3d 89, 94–96 (2d Cir. 2012). There the defendant was arrested outside an apartment building based on a report of having brandished and fired a pistol. *Id.* at 90. At the precinct, the defendant was questioned about the location of the firearm without having been Mirandized and he led police to his sister's apartment where they found the weapon. *Id.* The police sergeant testified that he had "a sense of urgency" because the defendant had been arrested close to a playground, ballfield, and church, and he felt that possibly the weapon could be "out there for anyone to get." *Id.* at 91. The court explained that several factors

> created an objectively reasonable need for officers to protect the public from the realistic possibility that Ferguson, having possessed a dangerous weapon as little as an hour before his arrest, had hidden that weapon in a public place. Thus, these factors differentiate this case from numerous others in which pre-*Miranda* questioning would not be permitted.

*Id.* at 95. The court added, "We recognize that, in certain circumstances, the passage of time between an arrest and an interrogation, among other considerations, may diminish the immediacy of the threat posed by an unaccounted-for firearm." *Id.*

In *United States v. Bowers*, which involved the notorious massacre at the Tree of Life synagogue in Pittsburgh, Pennsylvania, the district court held that the public safety exception applied to certain questioning of the defendant even after he had invoked his *Miranda* rights and been taken to the hospital. 676 F. Supp. 3d 403, ___, 2022 WL 195819, at *1, *7–8, *12 (W.D. Pa. Jan. 20, 2022). The court explained, "The questions posed by the SWAT officers were designed

to ensure the safety of the officers and the public rather than to elicit incriminating answers." *Id.* at ___, 2022 WL 195819, at *12.

But such cases are relatively rare. More typical is *People v. Ingram*, where the Colorado Supreme Court found the public safety exception inapplicable to off-site questioning about a missing firearm. 984 P.2d 597, 604–05 (Colo. 1999) (en banc). In that case, the defendant had been arrested in connection with a shooting after driving away from the scene. *Id.* at 600–01. The defendant did not have a gun on his person. *Id.* at 601. Several hours after his arrest, despite the defendant's invocation of his *Miranda* rights, he was questioned at the sheriff's department as to "what type of gun he owned and where the gun was located." *Id.* The court noted, "Ingram had been safely in custody for several hours and had already invoked his *Miranda* rights, demonstrating that there was no 'immediate necessity' which would justify Detective Birch's decision not to scrupulously honor Ingram's invocation of his right to silence." *Id.* at 605; *see also People v. Dennis*, 866 N.E.2d 1264, 1276–77 (Ill. App. Ct. 2007) (holding that the public safety exception did not apply to postarrest questioning of the defendant after he had been taken to the hospital and noting that "the police in the instant case were not confronted with a situation where the defendant had 'just' discarded a weapon in a crowded or populated area").

**C. Applying Iowa Code Section 804.20 to This Case.** So now we must decide how section 804.20 applies to the circumstances of the case. "We begin our inquiry in this case with the language of the statute as a whole." *Sewell*, 960 N.W.2d at 643 (quoting *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020)).

We agree with the State that the language "without unnecessary delay" means there must exist some circumstances when delay would be *necessary*. *See* Iowa Code § 804.20. Also, we note that the statute does not limit the *kinds of situations* that might necessitate delay. *Cf., e.g., In re C.Z.*, 956 N.W.2d 113,

121 (Iowa 2021) (discussing the principle that the legislature knows how to limit terms it is using); *State v. Kelso-Christy*, 911 N.W.2d 663, 665, 667 (Iowa 2018) (noting that the broad term "against the will of the other" was not limited by the legislature and could include the situation where the victim had been defrauded by the defendant into believing the defendant was someone else); *Vance v. Iowa Dist. Ct.*, 907 N.W.2d 473, 478 (Iowa 2018) ("[W]e may not expand or alter the language of [the statute at issue] to create this distinction since it is not evident from the language used by the legislature that it intended to create this limitation."); *Nelson v. Lindaman*, 867 N.W.2d 1, 10 (Iowa 2015) ("This court has no power to read a limitation into the statute that is not supported by the words chosen by the general assembly." (quoting *Cubit v. Mahaska County*, 677 N.W.2d 777, 782 (Iowa 2004))). Thus, it is conceivable that public safety could be one such situation. Consider, for example, the possibility that the police learn that the detainee had left weapons in an area frequented by children *after* the detainee arrived at the police station.

We note that in 1976, the legislature removed the specific exception for "cases of imminent danger of escape" from the statute. *Compare* 1959 Iowa Acts ch. 373, § 1 (codified at Iowa Code § 755.17 (1962)), *with* 1976 Iowa Acts ch. 1245 (ch. 2), § 421 (codified at Iowa Code § 804.20 (Supp. 1977)). At the same time, the legislature left in place the "without unnecessary delay" language that accompanied the right to call and consult with a family member or attorney. 1976 Iowa Acts ch. 1245 (ch. 2), § 421 (codified at Iowa Code § 804.20 (Supp. 1977)). And, it added similar "without unreasonable delay" language to the detainee's right of confidential consultation with their attorney after the attorney arrived at the place of detention. *Id.* It would make no sense to conclude that the legislature took out the "escape" language to assure that detainees who were about to escape could contact a family member or attorney immediately. We

think it is more logical to conclude that the legislature believed that the "without unnecessary delay" language was broad enough to cover *any* potential reason for deferring the right to call, consult, or see a family member or attorney— including the public safety threat posed by the imminent danger of escape.

Not only is the language "without unnecessary delay" seemingly broad enough to allow for a delay based on an overarching safety concern, but such an interpretation also seems consistent with our existing practical approach to section 804.20. Our cases already allow the statutory right of communication and consultation to be limited or denied where (1) the arrestee wants to contact a family member who is also alleged to be part of the criminal conspiracy, *Bowers*, 661 N.W.2d at 542, (2) there is a no-contact order between the parties, *Tubbs*, 690 N.W.2d at 914, (3) the two-hour time window for chemical testing is running out, *Walker*, 804 N.W.2d at 290, or (4) the attorney is aware of monitoring at the place of detention and fails to ask for a room that is not monitored, *Lamoreux*, 875 N.W.2d at 180–81.

All things considered, we believe the cases interpreting the public safety exception to *Miranda* provide a useful guidepost to consider when we examine whether a delay under Iowa Code section 804.20 was "necessary." The Supreme Court spoke of "immediate necessity" in *Quarles*. 467 U.S. at 657. That phrasing sounds like the flip side of "unnecessary delay" in section 804.20. Moreover, to some degree, both *Miranda* and section 804.20 protect similar interests through the mechanism of access to counsel.

Reviewing the facts here, law enforcement did not proceed "without unnecessary delay." When Starr was arrested, he was not questioned at the scene about the guns or taken to the location of the burglary to help find them. Significantly, section 804.20's right to call and consult a family member or

attorney is not triggered until the detainee arrives at the place of detention. *Davis*, 922 N.W.2d at 332.

Instead, Starr was brought directly to the police station. Then, forty-seven minutes elapsed from when police put Starr in the interrogation room until Detective Grimsley arrived to question him. A couple of minutes later, Detective Grimsley read the *Miranda* warnings to Starr. Notably, Detective Grimsley did not believe the circumstances were urgent enough to ask Starr about the guns or to forgo *Miranda* warnings at that point. We do not doubt the police were genuinely concerned about what had happened to the guns, but they were willing to tell Starr at the outset that he could remain silent if he wanted to.

Seven minutes after that, Starr asked to make a call to his father to get an attorney, and Detective Grimsley responded that that "wouldn't happen today." Detective Grimsley didn't say, "I need to know first where the guns are." Another fifty-one minutes of discussion between Starr and Detective Grimsley passed before Detective Grimsley brought up the subject of the missing firearms.

In other words, the stolen guns didn't come up until nearly two hours after Starr had been taken into custody for questioning at the police station. Before getting to the subject of the guns, Detective Grimsley questioned Starr for investigative purposes about his stabbing of M.N. *See Quarles*, 467 U.S. at 659 (noting that the officer "asked only the question necessary to locate the missing gun"); *Deases*, 518 N.W.2d at 791 (declining to apply the public safety exception while noting that the officer's questions did not reflect only the limited purpose of asking about the potential threat to public safety).

Additionally, by the time *any* of Detective Grimsley's questioning occurred, over a full day had gone by since the firearms had been stolen. The lockdowns of the schools and the hospital had been lifted. There had been no reports of the guns being used. And there was nothing specific to indicate they had been

abandoned—unlike the guns in *Quarles* and *J.D.F. See Quarles*, 467 U.S. at 652; *J.D.F.,* 553 N.W.2d at 587.

We conclude that Starr was not afforded his right to call a family member "without unnecessary delay." While it was certainly plausible that the missing firearms could have posed a threat to public safety and that Starr knew their whereabouts, the situation lacked the immediacy of *Quarles*, *J.D.F.*, *State v. Simmons*, or other cases where the *Miranda* public safety exception has been invoked. *See Quarles*, 467 U.S. at 657; *Simmons*, 714 N.W.2d at 275; *J.D.F.,* 553 N.W.2d at 588. Moreover, the Sioux City police acted as if it lacked that immediacy, waiting nearly two hours from the time Starr was deposited at the police station before bringing up the subject of the missing guns.

All criminal investigations are intended to lead to greater public safety. But delay in honoring a detainee's invocation of section 804.20 must be necessary; that is, it must be targeted narrowly to the prompt resolution of an immediate public safety threat. That was not the case here. The delay—objectively viewed under all the circumstances—occurred in the context of an overall investigation of Starr's criminal spree rather than as a quick postponement to permit resolution of a paramount public safety matter.

**V. Conclusion.**

For the foregoing reasons, we affirm the suppression order of the district court and remand for further proceedings.

**AFFIRMED AND REMANDED.**