**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Jason Christopher INGRAM, Defendant–Appellee.**

**No. 99SA118.**

Supreme Court of Colorado, En Banc.

June 28, 1999.

F. Michael Goodbee, District Attorney, Fifth Judicial District, Mark Hurlbert, Deputy District Attorney, Georgetown, Colorado, Attorneys for Plaintiff–Appellant.

Meinert & Hodges, LLC, Timothy A. Meinert, Anne Hodges–Parmley, Dillon, Colorado, Attorneys for Defendant Appellee.

Justice RICE delivered the Opinion of the Court.

The prosecution brought this interlocutory appeal pursuant to C.A.R. 4.1 to challenge an order entered by the Clear Creek County District Court suppressing all evidence and statements obtained as a result of the defendant's arrest. The trial court granted the defendant's motion to suppress, holding that the defendant's arrest violated his Fourth Amendment rights. The trial court further held that the defendant's statement that he owned a gun was inadmissible, as it was not only a fruit of the illegal arrest, but also was taken in violation of the defendant's Fifth Amendment rights. We reverse the order of suppression with respect to the defendant's Fourth Amendment claims and remand the case to the trial court for additional findings of fact and conclusions of law, as the record before us is insufficient to permit appellate review. However, we affirm the portion of the trial court's order in which it suppressed the defendant's admission of gun ownership.

## I.

The defendant, Jason Ingram (Ingram), was charged in Clear Creek District Court with two counts of felony menacing,[1] tampering with physical evidence,[2] reckless endangerment,[3] and driving while ability impaired.[4] Prior to trial, he filed a motion to suppress all of the evidence and statements gathered by police in the case.

The trial court conducted a suppression hearing at which the following facts were established. Mike Lilley, a deputy sheriff for the Clear Creek County Sheriff's Office, received a call at 12:45 a.m. on October 25, 1998, regarding a disturbance at a house on

1. *See* § 18–3–206, 6 C.R.S. (1998).

2. *See* § 18–8–610(1)(a), 6 C.R.S. (1998).

3. *See* § 18–3–208, 6 C.R.S. (1998).

4. *See* § 42–4–1301(1)(b), 6 C.R.S. (1998).

Colorado Highway 103. The dispatch also indicated that gunshots had been fired. Deputy Lilley drove toward the location and requested backup.

At approximately 1:00 a.m., as Deputy Lilley was driving along Highway 103 toward the site of the alleged shooting, he noticed Ingram's vehicle coming toward him at a high rate of speed with the "body rolling as it went through the curves." Highway 103 is a winding, mountain road which was icy in places on the date in question. As Ingram passed him, Deputy Lilley noticed that he hit the brakes hard, causing the car body to roll forward. Deputy Lilley turned his patrol car around, turned on his overhead lights, and stopped Ingram's vehicle. Ingram was the driver of the vehicle. His wife, Ulla Ingram, was seated in the passenger seat. Deputy Lilley advised Ingram that he was driving at an unsafe speed for the conditions, and asked Ingram to produce his driver's license, registration, and proof of insurance. During the course of the conversation, Deputy Lilley noted that Ingram smelled of alcohol; however, Ingram claimed that he had not been drinking. When Deputy Lilley asked Ingram if he was coming from a party on Highway 103, Ingram answered "yes." Deputy Lilley then told Ingram that he was investigating a disturbance at a party on Highway 103, but that if Ingram's information was valid, Ingram and his wife "would be on their way."

The check on Ingram's driver's license revealed that it was under denial. Upon learning this information, Deputy Lilley asked Ingram to step out of the car, at which time he observed that Ingram was unsteady on his feet. Deputy Lilley performed a "cursory examination" of Ingram's ability to drive. The results of these tests led Deputy Lilley to believe that Ingram was too intoxicated to drive. Deputy Lilley then asked Ingram again where he had been earlier in the evening, at which point Ingram stated that he had "nothing more to say."

During the course of the stop, Deputy Lilley was listening to his police radio. He overheard conversations among fellow officers to the effect that, although officers had

arrived at the scene of the alleged disturbance, no one had answered the door. Deputy Lilley learned that the officers on the scene had requested backup and that the investigation was continuing. Ingram was also in a position to hear the police radio. When Ingram heard that the investigation was in progress, he "rolled his eyes back and said, 'oh shit.'" Deputy Lilley then placed both Ingram and his wife in handcuffs, which he believed to be necessary for his own safety. Officer Lilley explained to Ingram that he was not under arrest but was being detained for investigation of his involvement in or knowledge of the shooting. Deputy Lilley informed Ingram and his wife that they could face criminal charges for withholding information in a criminal investigation, to which Ingram replied, "I would like to tell you something, officer, but I don't know anything more." At some point after placing Ingram in handcuffs, Deputy Lilley learned that Ingram's driver's license was, in fact, not under denial.

Thereafter, a trooper with the Colorado State Patrol, Mark Savage, arrived at the scene of the stop. Trooper Savage estimated that he arrived at the scene at approximately 1:17 a.m. Notably, daylight savings time ended and standard time began at 2:00 a.m. on October 25. As a result, clocks were turned back one hour. Therefore, although Trooper Savage arrived at 1:17 a.m. on October 25, Ingram had already been detained by Deputy Lilley for approximately one hour and twenty minutes. Trooper Savage advised Ingram that he was investigating the shooting on Highway 103. He also advised Ingram that he was suspected of driving while intoxicated. While Ingram's hands were still cuffed, Deputy Lilley and Trooper Savage placed paper bags over them in order to preserve any evidence of gunshot residue which might have been present on his hands. Trooper Savage then advised Ingram of his *Miranda* [5] rights, and Ingram declined to waive those rights. Trooper Savage asked Ingram if he would participate in voluntary roadside tests in order to determine whether he was intoxicated. Ingram agreed to the roadside tests, which he performed while his

---

**5.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

hands were still cuffed. Trooper Savage believed that Ingram's performance on the roadside tests was unsatisfactory. After Trooper Savage administered the roadside tests, he placed Ingram in the back of his patrol car.

Ingram was not arrested for investigation of driving while under the influence. Instead, at approximately 2:00 a.m., Deputy Lilley received information from an officer at the scene of the shooting that one of the witnesses had identified Ingram by name as the shooter. At that time, Ingram was placed under arrest for felony menacing. The record reflects that approximately two hours had passed from the time Officer Lilley initially stopped Ingram to the time of his arrest.

After Ingram was placed under arrest, Trooper Savage brought him to the scene of the disturbance and shooting that had occurred earlier in the evening. At the scene, witnesses identified Ingram as the person who had been involved in the earlier incident. Following the identification, Trooper Savage transported Ingram to the Sheriff's Department. Ingram's hands were tested for gunshot residue upon his arrival at the Sheriff's Department.

Another investigator for the Sheriff's Department, Detective Birch, arrived at the Sheriff's Department in order to assist in the investigation. As the officers at the scene of the traffic stop found no gun in Ingram's car or on his person, Detective Birch called Ingram's mother and asked her whether Ingram owned a handgun. Ingram's mother told Detective Birch that her son did own a handgun, but that she could not identify what type of gun it was.

Although Detective Birch was aware that Ingram had refused to waive his *Miranda* rights, he initiated an interview with Ingram at approximately 4:10 a.m. Detective Birch asked Ingram to tell him what type of gun he owned and where the gun was located. Detective Birch informed Ingram that the information he was requesting could not be used against him later in court. Detective Birch told Ingram that he needed to know this information because he was concerned that the handgun would fall into the wrong hands.

Ingram then told Detective Birch that the gun was a black, Springfield, nine-millimeter, semi-automatic handgun; however, he claimed that he did not know where it was located.

Detective Birch then proceeded to interview Ingram's wife, who was also in custody at the Sheriff's Department. Like her husband, Ulla Ingram had previously invoked her *Miranda* rights. Again, Detective Birch claimed that he was only seeking information in order to recover the gun and that such information would not be used against her in court. Detective Birch explained that he was concerned that someone could injure themselves with the gun if it was not recovered by the police. Ulla Ingram told Detective Birch that Ingram had instructed her to throw the gun out of the car window when he first saw Deputy Lilley's police car. This information enabled the police to locate the gun, which was recovered a few feet off the highway in the area where Ingram's vehicle and Deputy Lilley's vehicle had first passed one another.

## II.

Ingram moved to suppress all evidence and statements obtained as a result of his arrest on the grounds that they were the fruits of an illegal arrest. Specifically, Ingram argued that he was arrested without probable cause in violation of his Fourth Amendment rights. Additionally, Ingram asserted that his statements to police were taken in violation of *Miranda,* as Detective Birch interrogated him after he had invoked his right to remain silent. At the hearing on the motion to dismiss, the prosecution argued that Ingram's arrest was supported by probable cause. The prosecution further claimed that while Detective Birch's interrogation of Ingram occurred after Ingram had already invoked his *Miranda* rights, this interrogation was supported by the "public safety" exception to *Miranda* set forth in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The trial court granted the motion to suppress in its entirety, finding as follows:

But it seems to me that there's an important distinction between the case where a

guy has been advised of his Miranda rights and has said I don't want to talk, and then is persuaded to talk under a promise that it isn't going to be used against him. The public safety issue remains the same, but the suppression issue it seems to me is quite different under the circumstances. Again, no law has been cited to me, but that just seems like it's a distinction of significance.

The whole scenario is a little bizarre. It seems to me that the focus of the investigation, the focus of the concern, was not a driving violation and it was not even DUI, but it was the safety issue, the shooting, and I – I think I can accept the view that an officer is driving along the road, it's taken him some time driving along this road and he hasn't seen a car, he stops this car, and for a period of hours the only people on the road are the two officers and this one car. It's an isolated area, I think, you know, even without major significant flurry of gestures or escape-type evidence there was a reasonable suspicion to stop this car as to being the only thing possibly involved with that shooting incident. And so I—I can accept that stop.

My problem with it is that the detention has to be reasonable and it has to be for a reasonable time, and although a whole bunch of things happened, first of driving under denial, the odor of alcohol, the denial of alcohol when it was obvious, the bloodshot eyes, it seems to me that the officer was clear that he testified that it was two out of six rather than four out of six of the nystagmus indicia. I would assume Mr. Hurlbert [the prosecutor] is arguing that two of those are the failure to hold the head straight. I don't think there's any testimony that the defendant was instructed he had to hold his head straight, and simply the officer wasn't relying on more than the one indicia from each eye.

So again, it's tenuous but the total length of holding him and after the two officers are there, having him handcuffed, it's—it seems to me that it's hard to say that that is truly reasonable. And also there's a lot of wasted time. It seems like there's hardly anything happening. I assume that what's happening is we're waiting for information from the scene. And also it's an isolated place and hard to get people to, but I—it seems to me that the valid stop was—I mean, that the initial stop was fine, but that it just took too long just hanging around in the cold listening to three CDs and waiting for something.

So my gut feeling is that the period and the totality of the circumstances in detention are unreasonable and that the—the DUI information does not arise to probable cause until at least well after the reasonable purposes have expired.

. . . .

With respect to the fruits, you know, there's no testimony indicating – I don't believe there was any testimony that indicated that Mrs. Ingram did not know that Mr. Ingram had implicated himself as the owner of the gun and had implicated himself with respect to the cartridges, so the flavor of the evidence is to the effect that it – that it would very likely not have been discovered without her – I mean with her statement without his.

So again, the preponderance of the evidence to me is that the discovery of the weapon was if not entirely certainly majorly a fruit of Mr. Ingram's disclosure.

Mr. Meinert: Judge, so I hear it is that the Court's ruling the length of detention being unreasonable that all evidence obtained after that would be suppressed?

The Court: That's certainly my inclination at this time.

Mr. Hurlbert: Judge, when are you saying—just for a clarification, when are you saying the defendant was under arrest?

The Court: Well, if—I don't remember what the officers have said their perception of that was, but I would think that at some point after the reasonable detention, reasonable investigatory stop, after its period becomes unreasonable, the detention becomes noninvestigatory but custodial. Or at least not reasonable supported by the facts known at that time.

Mr. Hurblert: So it's not when he's handcuffed, but it's sometime after he's handcuffed that it——

The Court: I think it's quite possible that the initial handcuffing is reasonable. But then—because of safety issues and because of the – what it seems to me is the motivating issue in the arrest, that he – the investigation of a major dangerous offense. But when information doesn't come in confirming that, and when in an apparently haphazard and very slow developing process the DUI investigation goes on, but sometime after Officer—it begins with an "S"—

Mr. Meinert: Savage

The Court: After Officer Savage arrives and the safety issue becomes much less significant, and the investigation is – the investigation of the gun offense is at a standstill, and people begin to think, well, heck, maybe we ought to be investigating it as a DUI, and that isn't done with much articulable method. And certainly before he starts being transferred down to the – to the station to pick up his –

Mr. Meinert: Judge, based on that ruling, what I would ask the Court to do at this point is defer ruling on the constitutional motion. . . .

### III.

■ We will first address the trial court's findings of fact and conclusions of law with regard to Ingram's claim that his detention violated his Fourth Amendment rights. It is well established that police officers, operating with a reasonable suspicion of criminal activity, may conduct a brief investigatory stop without obtaining an arrest warrant. *See Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The investigatory stop must be "brief in duration, limited in scope, and narrow in purpose." *People v. Tottenhoff,* 691 P.2d 340, 343 (Colo. 1984).

■ A stop of a vehicle without a warrant is likewise authorized, provided three conditions exist: (1) the officer stopping the vehicle has a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place; (2) the officer has a reasonable objective for the intrusion; and (3) there is a reasonable connection between the scope and character of the intrusion and its objective. *See People v. Rodriguez,* 945 P.2d 1351 (Colo.1997); *see also People v. Altman,* 938 P.2d 142, 144 (Colo.1997).

■ With respect to the first requirement, when determining whether there is reasonable suspicion to conduct an investigatory stop, the trial court must consider whether, under the totality of the circumstances, the "specific and articulable facts" known to the officer at the time of the encounter and the rational inferences from these facts create a "reasonable suspicion of criminal activity to justify the intrusion into the defendant's personal security." *People v. Thomas,* 660 P.2d 1272, 1274 (Colo.1983). A reviewing court must base its analysis of whether reasonable suspicion exists on an objective analysis and not upon the subjective intent of the arresting officer. *See Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Rodriguez* 945 P.2d at 1359.

■ Next, assuming the trial court finds reasonable suspicion to justify the stop, it must determine if there was a reasonable objective for the intrusion. We note that if the investigating officer has reasonable suspicion to believe that a traffic offense has taken place, or that the driver is operating the vehicle while impaired, a reasonable objective of the stop may be to request a driver's license, vehicle registration, and proof of insurance, or to determine whether the driver is intoxicated. *See Rodriguez,* 945 P.2d at 1359. However, once a driver produces a valid license and proof that he is entitled to operate the vehicle, or satisfies the investigating officer that he is sober and capable of driving, the driver must be allowed to leave without being subject to further delay. *See People v. Redinger,* 906 P.2d 81 (Colo.1995); *see also United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997).

■ Finally, the trial court must determine whether there is a reasonable connection between the scope and character of the intrusion and its objective. In order to be reasonable, the investigatory stop must be "brief in duration, limited in scope, and narrow in purpose." *Tottenhoff,* 691 P.2d at 343.

An investigatory stop is brief in duration, limited in scope, and narrow in purpose if, among other factors: (1) the length of the detention is not unreasonable; (2) the officer diligently pursues the investigation during the detention; (3) the suspect was not unreasonably required to move from one location to another; and, (4) alternative, less intrusive means were used, if available, and the police acted reasonably in recognizing and pursuing such alternative means. *See Rodriguez*, 945 P.2d at 1361.

Unlike an investigatory stop, the constitutionality of which must be measured by reference to the standards set forth above, a warrantless arrest must be supported by probable cause. *See Tottenhoff*, 691 P.2d at 343. When an investigatory stop involves more than a brief detention and questioning, the stop escalates into an arrest, which must be supported by probable cause. *See Rodriguez*, 945 P.2d at 1361. Whether a person has been subjected to a limited investigatory stop or has been arrested without a warrant is a mixed question of fact and law, and must be decided by the trial court taking into account the totality of the circumstances. *See People v. Turtura*, 921 P.2d 40 (Colo. 1996).

In the absence of sufficient findings of fact and conclusions of law by the trial court, our appellate review function is hindered. *See People v. Sutherland*, 886 P.2d 681, 688 (Colo.1994). Accordingly, if the record below is not clear as to the factual basis for the trial court's order, we must remand with directions to the trial court to create an adequate record upon which to base its holding. *See id.*

Our review of the record below reveals that the trial court did not make the findings of fact and conclusions of law necessary to enable appellate review. Significantly, while the trial court found reasonable suspicion for the initial stop, we cannot determine from this record whether it identified at what point the stop escalated into an arrest. The trial court apparently ruled that the investigatory stop escalated into an arrest at some point *after* Ingram was handcuffed, but *before* he was transferred to the Sheriff's Department. This is simply too broad a finding to permit review, as the Fourth Amendment analysis of this issue rests upon a determination of the precise point at which this stop escalated into an arrest. Without this preliminary determination, it is impossible to decide whether the police had probable cause for the arrest and, if not, whether the evidence and statements obtained thereafter were fruits of the illegal arrest.

As such, on remand, the trial court must determine at what point Officer Lilley and Trooper Savage's investigatory stop of Ingram escalated into an arrest. Once the time of arrest is identified, the trial court must determine whether the arrest was supported by probable cause. If the trial court determines that Ingram was arrested without probable cause, it must then evaluate whether the evidence and statements obtained after that arrest should be suppressed as fruits of the illegal arrest. The foregoing analysis should be performed in accordance with the standards enunciated in *Rodriguez*, 945 P.2d 1351.

## IV.

We turn next to Ingram's statements to Detective Birch in which he admitted to owning a gun. In addition to the Fourth Amendment analysis described above, these statements must be analyzed under the Fifth Amendment.

In his motion to suppress, Ingram argued that Detective Birch's questioning regarding Ingram's ownership of a gun constituted unconstitutional custodial interrogation, as Detective Birch did not scrupulously honor his previous invocation of his right to silence. Accordingly, Ingram argued that his admission to Detective Birch that he owned a black, nine-millimeter weapon must be suppressed. While the prosecution conceded that Detective Birch did not scrupulously honor Ingram's invocation of his right to silence, it argued that Detective Birch's questioning regarding the gun falls within the "public safety" exception to *Miranda* set forth by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Accordingly,

the prosecution argued that Ingram's statement was admissible at his trial. The trial court agreed with the defendant and suppressed his statement, holding that the facts of the instant case did not warrant application of the public safety exception.

*Quarles* involved a police pursuit of an armed assailant. *See id.* at 652, 104 S.Ct. 2626. In *Quarles,* the police apprehended the defendant, handcuffed him, and frisked him after chasing him into a supermarket. The defendant was not advised of his *Miranda* rights. Upon discovering that the defendant had an empty gun holster strapped to his shoulder, an officer asked where the gun was located. At that point, the defendant directed officers to an empty carton in the supermarket where he had hidden the gun. The Court held that although the officer's question regarding the gun's location constituted custodial interrogation in violation of the prophylactic rule stated in *Miranda,* the defendant's statement was voluntary, and therefore, constitutionally admissible. *See id.* at 654–55, 104 S.Ct. 2626.

In reaching its conclusion in *Quarles,* the Court decided that the exclusionary rule mandating the suppression of statements taken in violation of *Miranda* was inapplicable, as the police had been justified in failing to give the *Miranda* warnings to the defendant before asking him about the location of the gun. *See id.* at 658, 104 S.Ct. 2626. Specifically, the Court emphasized that this narrow exception to the *Miranda* rule was justified in light of the fact that the officers were confronted with the "immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *See id.*

Significantly, the Court in *Quarles* emphasized that this exception was only to be applied in cases in which the exigency of the circumstances warranted the momentary omission of *Miranda* warnings. *See id.* The Court believed that this exception would not be difficult to apply, as police officers "can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and

questions designed solely to elicit testimonial evidence from a suspect." *See id.* at 658–59, 104 S.Ct. 2626.

■ We conclude that the trial court was correct in holding that the public safety exception enunciated in *Quarles* is inapplicable to the facts of the instant case. Most significantly, we note that in *Quarles,* only the prophylactic protections of *Miranda* were at issue, whereas in the instant case, Ingram had invoked his *constitutional* right to remain silent. Furthermore, we note that the facts in *Quarles* are significantly different than those in the instant case. Ingram had been safely in custody for several hours and had already invoked his *Miranda* rights, demonstrating that there was no "immediate necessity" which would justify Detective Birch's decision not to scrupulously honor Ingram's invocation of his right to silence. Moreover, there was no exigency in the circumstances surrounding the interrogation.

In conclusion, it is clear that Detective Birch's interrogation was investigatory, as his questioning did not relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that exception to the *Miranda* rule was not warranted where police officers entered the defendant's boardinghouse four hours after a murder, awakened him, and interrogated him as to whether he owned a gun). Accordingly, we affirm the trial court's order suppressing Ingram's admission to Detective Birch that he owned a gun.

## V.

We conclude that the trial court's findings of fact and conclusions of law with respect to the defendant's Fourth Amendment argument are insufficient to permit review by this court. However, we conclude that the trial court did not err when it suppressed the defendant's admission that he owned a gun. Accordingly, we affirm in part and reverse in part the order of the trial court and remand with instructions to enter new findings of fact and conclusions of law with respect to the

defendant's arguments under the Fourth Amendment.

Justice SCOTT does not participate.