22CA0853 Peo v Pinheiro 07-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0853
City and County of Denver District Court No. 17CR5304
Honorable Jennifer B. Torrington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joe Pinheiro,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Brown and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 24, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Joe Pinheiro, appeals his judgment of conviction and sentence for second degree murder.  We affirm the conviction, reverse the sentence, and remand the case with directions.

## I.    Background

¶ 2    One summer day, Pinheiro went to a police station and called 911.  He gave the 911 operator his name, told her that he was outside the police station, and that he "needed a detective."  When asked the nature of the emergency, Pinheiro reported that he had "just shot and killed somebody" about "fifteen, twenty minutes ago." He declined to give the operator the victim's location but said he would give the address to the detective.  He also disclosed that he had a bag with two unloaded guns.  Officers quickly arrived, arrested Pinheiro, and advised him of his rights.

¶ 3    After Pinheiro later revealed the victim's location to a detective, officers found the victim dead with a single gunshot wound to the chest.

¶ 4    The prosecution charged Pinheiro with first degree murder. Pinheiro didn't testify at trial, but his attorney defended on the theory that the killing "was a tragic accident" and Pinheiro did not intentionally or knowingly kill the victim.

¶ 5     The jury convicted Pinheiro of the lesser included offense of second degree murder.  The district court sentenced him to forty-eight years in prison.

¶ 6     On appeal, Pinheiro contends that the district court erred by (1) violating his Fifth Amendment rights and failing to suppress involuntary statements made after he invoked his right to counsel along with the physical evidence obtained from those statements, (2) allowing the prosecutor to commit misconduct during rebuttal closing argument, (3) modifying his theory of defense instruction, (4) violating his right to speak at sentencing, and (5) failing to state any reason for imposing the maximum forty-eight-year sentence. He also maintains that the cumulative effect of the errors warrants reversal of the conviction and, if not the conviction, the sentence. We address each contention in turn.

## II.    Suppression

¶ 7     Pinheiro first contends that the district court erred by denying his motion to suppress statements he made to a detective disclosing the location of the victim's body — together with the physical evidence that was found at the location.  He specifically argues that the statements and evidence should've been suppressed because

2

they were (1) obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) involuntary. We agree that the district court erred by admitting the statements under the public safety exception to *Miranda* but conclude that the error does not require reversal. We disagree that Pinheiro's statements were involuntary.

### A. Additional Background

#### 1. Pinheiro's Statements

¶ 8     Outside the police station, Pinheiro called 911 to report that he had "shot and killed" someone. He asked for a detective, disclosed that he had a bag with two unloaded guns, and said he would give the detective more information when the detective arrived. Officers swiftly responded and arrested him. As an officer started to look through his bag, Pinheiro volunteered, "It's the very first one in the front that you need." Officers found two handguns in Pinheiro's bag. An officer then read Pinheiro his *Miranda* rights. Pinheiro confirmed he understood his rights and that he still

wanted to speak with a detective as he had "asked for originally." The parties agreed that these statements were admissible.[1]

¶ 9    Pinheiro was then placed in a booking room. While there, Detective Bryan Valenzuela and another officer interacted with Pinheiro at various points. Portions of the booking room interview are not in the record, but all agreed, and the district court found, that Pinheiro twice invoked his right to counsel while in the booking room. At some point when Detective Valenzuela was not in the room, the other officer questioned Pinheiro after he had invoked his right to counsel. While the record doesn't disclose exactly what Pinheiro said to the officer, the parties agreed that the statements made to the officer were not admissible.

¶ 10    That leads us to the disputed last set of statements. About two and a half hours after the 911 call, and after Pinheiro had invoked his right to counsel, Detective Valenzuela re-entered the booking room and told Pinheiro that based on the information they had, there was "still an exigency" to verify whether someone might be injured or need medical attention, and he needed to ask Pinheiro

---

[1] No one disputed the admissibility of the 911 call, and it was admitted by stipulation at trial.

4

for the location of the "alleged victim." Pinheiro provided the address and answered a few follow-up questions about the house, general directions to the house, and where they could find the victim in the house. This exchange lasted less than five minutes.

¶ 11 At the disclosed address, officers found the victim, along with a fired cartridge case that was later identified as having been fired by one of Pinheiro's guns.

## 2. The Motion to Suppress

¶ 12 Before trial, Pinheiro moved to suppress the statements to Detective Valenzuela and the resulting physical evidence, arguing that they were obtained in violation of his Fifth Amendment rights.

¶ 13 At the suppression hearing, the prosecution did not dispute that Pinheiro had invoked his right to counsel and was subject to custodial interrogation. Instead, the prosecution argued that the statements to Detective Valenzuela were voluntary and admissible under the public safety exception.

¶ 14 In a written order, the district court denied the motion to suppress. The court found that the public safety exception applied and that the statements were voluntary. As to the public safety exception specifically, the court concluded that Detective

5

Valenzuela's "questioning clearly concerned an immediate need to protect a member of the public, as well as investigating officers, from potential harm."

### B. The Public Safety Exception

¶ 15 We consider first the district court's conclusion that Pinheiro's statements to Detective Valenzuela were admissible under the public safety exception.

### 1. Legal Principles and Standard of Review

¶ 16 Before conducting a custodial interrogation, an officer must advise a suspect of certain rights, including the right to remain silent and the right to counsel. *Miranda*, 384 U.S. at 444. When a suspect invokes his right to counsel during an interrogation, the police must cease questioning. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *accord People v. Kutlak*, 2016 CO 1, ¶ 14. Statements made after a suspect invokes his right to counsel are generally not admissible. *Miranda*, 384 U.S. at 478-79. But decades ago, the Supreme Court carved out a narrow public safety exception to *Miranda*. *See New York v. Quarles*, 467 U.S. 649, 657-58 (1984); *accord Perez v. People*, 2021 CO 5M, ¶ 18. The exception permits pre-*Miranda* questioning "reasonably prompted by a

concern" for public or officer safety. *Quarles*, 467 U.S. at 656; *see also Perez*, ¶ 23 (considering whether the questioning "relates to an objectively reasonable need to protect the public from immediate danger"). And it applies if the exigency of the circumstances warrants the momentary omission of *Miranda* warnings. *Quarles*, 467 U.S. at 658.

¶ 17     The important question is whether, under the totality of the circumstances, there's an objectively reasonable need to protect the public or officers from an immediate danger. *Perez*, ¶ 23; *see also People v. Mullins*, 532 P.2d 733, 735 (Colo. 1975). For that reason, the exception is typically applied to situations where an officer first arrives at the scene or first encounters a suspect. *See, e.g., Perez*, ¶¶ 26-27 (applying exception when officers apprehended fleeing suspect and immediately asked about the location of a gun); *People v. Janis*, 2016 COA 69, ¶ 56 (applying exception when officers arriving on the scene had legitimate concerns about the existence of weapons), *rev'd on other grounds*, 2018 CO 89; *People v. Requejo*, 919 P.2d 874, 879 (Colo. App. 1996) (applying exception "to protect the safety of officers engaged in immediate, on-scene investigation of a crime"). When that has not been the case, and when the

suspect "ha[s] been safely in custody for several hours and ha[s] already invoked his *Miranda* rights," our supreme court has not applied the public safety exception. *People v. Ingram*, 984 P.2d 597, 605 (Colo. 1999).

¶ 18 Whether the public safety exception applies presents a mixed question of fact and law. *See Perez*, ¶ 14. We defer to the district court's factual findings if they are supported by the record, but we review its legal conclusions de novo. *Id.*

### 2. The District Court Erred by Applying the Public Safety Exception

¶ 19 Pinheiro contends that the district court erred by applying the public safety exception because he says that the exception doesn't apply to suspects that have been Mirandized and invoked their right to counsel. Alternatively, he argues that even if the exception does apply generally to such circumstances, it didn't apply here because the questioning came hours after Pinheiro was taken into custody and there wasn't any immediate danger to public safety.

¶ 20 To be sure, this is not the typical situation in which the public safety exception applies. Most Colorado cases addressing the exception involve pre-*Miranda* questioning. *See, e.g., Quarles*, 467

U.S. at 657-59; *Perez*, ¶¶ 26-27.  But in *Ingram*, our supreme court considered the public safety exception in a case where the suspect was Mirandized and invoked his right to silence.  *Ingram*, 984 P.2d at 605.  And while *Ingram* distinguished *Quarles* on the basis that it involved pre-*Miranda* questioning, it also analyzed whether an immediate necessity or exigency justified the post-*Miranda* questioning.  *Id.*  Though it ultimately concluded that the public safety exception didn't apply to the facts presented, the holding suggests that the exception may extend to a suspect who has been given his *Miranda* warnings and invoked his right to silence if there is an immediate or exigent public or officer safety need to justify the questioning.  *See id.*[2]

---

[2] To the extent Pinheiro claims that even if the public safety exception applies after a suspect has been Mirandized, it only applies where a suspect has invoked his right to silence, we disagree.  We see no reason why the public and officer safety concerns would be different where a suspect invokes his right to counsel versus his right to silence.  *See United States v. Paetsch*, 900 F. Supp. 2d 1202, 1220-21 (D. Colo. 2012) ("The public-safety exception applies not only to interrogation that occurs prior to the giving of *Miranda* warnings, but also applies to interrogation that occurs after a suspect has requested to speak to an attorney." (citing *United States v. DeSantis*, 870 F.2d 536, 541 (9th Cir. 1989))), *aff'd on other grounds*, 782 F.3d 1162 (10th Cir. 2015).

¶ 21    Even so construing *Ingram*, the exception doesn't apply to the circumstances here. Detective Valenzuela's questioning occurred neither "on the scene" nor even when the detective first encountered Pinheiro. Rather, it occurred over two and a half hours after Pinheiro was arrested. At that point, there was no situation posing an immediate threat to officer or public safety. *Cf. Quarles*, 467 U.S. at 657; *Requejo*, 919 P.2d at 879. The People don't contend otherwise.

¶ 22    True, the location of the victim was unknown. But even assuming that the public safety exception applies to locating a single individual — as opposed to protecting the public at large — the detective still waited several hours to ask Pinheiro about the victim's location. And well-intentioned though he might have been, the fact that the detective waited several hours to press the issue undercuts any claim that there was an objectively reasonable belief of immediate or exigent danger. *See Ingram*, 984 P.2d at 605 (public safety exception didn't apply where questioning occurred hours after the suspect was arrested and Mirandized). Beyond that, there wasn't any basis for the detective's belief that the victim might be injured. Unlike some cases where it's unknown if anyone had

been injured and needed medical care, *see, e.g.*, *People v. Wakefield*, 2018 COA 37, ¶¶ 55-57, Pinheiro plainly reported to the 911 operator that he had "shot and killed" someone fifteen to twenty minutes ago and then surrendered two unloaded guns to officers. That makes this case much different from those cases where officers, "having just arrived on the scene, had a legitimate" and immediate concern that there could be unknown "armed suspects or injured victims in the vicinity." *Id.* at ¶ 57; *see also United States v. Padilla*, 819 F.2d 952, 961 (10th Cir. 1987) (public safety exception applied to on-the-scene questioning about the possibility of injured or armed person).

¶ 23    For these reasons, we conclude that the district court erred by admitting Pinheiro's statements to Detective Valenzuela under the public safety exception.[3]

---

[3] For the first time on appeal, the People contend that the statements are admissible under the rescue doctrine. The prosecution, however, did not raise the rescue doctrine before the district court, and the district court didn't apply it. We therefore decline the People's invitation to address this issue for the first time on appeal.

11

### 3. The Admitted Statements Do Not Require Reversal

¶ 24   We must determine, then, whether the admission of Pinheiro's statements, in violation of his Fifth Amendment rights, was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11 (a trial error of constitutional dimension requires reversal unless the error was harmless beyond a reasonable doubt). To make that determination, we consider (1) the statements' importance to the prosecution's case; (2) whether the statements are cumulative; and (3) the overall strength of the prosecution's case. *People v. Allen*, 199 P.3d 33, 37 (Colo. App. 2007). We will reverse if there is a reasonable possibility that Pinheiro's statements to Detective Valenzuela might have contributed to his conviction. *Hagos*, ¶ 11.

¶ 25   For a few reasons, we conclude that no such reasonable possibility exists. First, although not cumulative, the statements were unimportant and irrelevant to the only disputed issue at trial, which was whether the shooting was accidental. After all, Pinheiro had already admitted that he had shot and killed a person and had handed over the murder weapon. The prosecutor argued that Pinheiro acted intentionally or knowingly while defense counsel

12

maintained the shooting was an accident. Nothing in Pinheiro's statements to the detective said anything about his intent or even about the shooting itself. Rather, Pinheiro simply provided an address, volunteered that two dogs were in the house, described the house, gave general directions to it, clarified that the victim was in the basement, and stated the victim's name.

¶ 26  Second, the prosecution presented considerable circumstantial evidence on the only disputed issue — whether Pinheiro acted with intent or knowledge. *See People v. Johnson*, 2024 CO 32, ¶ 36 (observing that intent "can, and often must, be proved by circumstantial evidence") (citation omitted). Namely, the evidence showed that the victim died almost instantly of a single gunshot wound to the chest. An expert testified that the victim was shot at "very close" range — meaning "within one inch." And the expert explained that it was possible that the gun was in "contact" with the victim's shirt when the gun was fired. Beyond that, there was no evidence either at the crime scene or on Pinheiro suggesting that he tried to render aid to the victim (as one reasonably would expect in an accidental shooting).

¶ 27    Finally, Pinheiro's voluntary confession to the 911 operator after the shooting was deliberate and calm, not panicked.  And despite Pinheiro's arguments to the contrary, this combined circumstantial evidence is what the prosecution relied on in closing argument to demonstrate that Pinheiro acted with intent or knowledge — not Pinheiro's statements to Detective Valenzuela about the victim's location.

¶ 28    Given all this, although the district court erred by admitting Pinheiro's statements to Detective Valenzuela under the public safety exception, we conclude that the error was harmless beyond a reasonable doubt.

## C.    Voluntariness

¶ 29    We next consider whether the district court erred by concluding that Pinheiro's statements were voluntary.  If they weren't voluntary, then the physical evidence obtained from the statements should also have been suppressed.  *People v. Bradshaw*, 156 P.3d 452, 459-60 (Colo. 2007) (explaining that although the

14

fruit of the poisonous tree doctrine doesn't apply to *Miranda*
violations, it does applies apply to coerced statements).[4]

### 1. Legal Principles and Standard of Review

¶ 30 The Due Process Clauses of the United States and Colorado Constitutions require that "a defendant's statements must be voluntary to be admissible as evidence." *People v. Ramadon*, 2013 CO 68, ¶ 18; U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. A statement is involuntary only if "coercive governmental conduct played a significant role in inducing the statement." *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010).

¶ 31 To determine whether a statement was voluntary or coerced, we consider (1) whether the police conduct was coercive and, if so, (2) whether the coercive conduct played a significant role in inducing the statement. *People v. Coke*, 2020 CO 28, ¶ 19.

¶ 32 And to decide whether the conduct was coercive, we consider the following, non-exhaustive list of factors:

---

[4] Pinheiro acknowledges that, absent a finding that the statements were involuntary, the fruit of the poisonous tree doctrine doesn't apply to the physical evidence obtained after a *Miranda* violation. *See New York v. Quarles*, 467 U.S. 649, 654 (1984); *People v. Gosselin*, 205 P.3d 456, 461 (Colo. App. 2008).

(1)     whether the defendant was in custody;

(2)     whether the defendant was free to leave;

(3)     whether the defendant was aware of the situation;

(4)     whether the police read *Miranda* rights to the defendant;

(5)     whether the defendant understood and waived *Miranda* rights;

(6)     whether the defendant had an opportunity to confer with counsel or anyone else before or during the interrogation;

(7)     whether the statement was made during the interrogation or volunteered later;

(8)     whether the police threatened the defendant or promised anything directly or impliedly;

(9)     the method of the interrogation;

(10)   the defendant's mental and physical condition just before the interrogation;

(11)   the length of the interrogation;

(12)   the location of the interrogation; and

(13)   the physical conditions of the location where the interrogation occurred.

*Id.* at ¶ 20 (citation omitted).

¶ 33    When, as here, the interrogation is video-recorded, and there are no disputed facts outside the recording pertinent to the suppression issue, we are in the same position as the district court in determining whether the statements are voluntary. *Ramadon*, ¶ 21. In any event, "the ultimate determination of whether a statement is voluntary is a legal question" that we review de novo. *Effland*, 240 P.3d at 878.

### 2.    The Statements Were Voluntary

¶ 34    We conclude that Pinheiro's statements to Detective Valenzuela were not the product of government coercion.

¶ 35    We acknowledge that the factors do not all cut one way. As Pinheiro points out, he was in custody, he was not free to leave, he made the statements during questioning at the police station, and the detective knew that Pinheiro had invoked his right to counsel before he asked Pinheiro about the victim's location.[5]

---

[5] To the extent Pinheiro relies on a separate interaction with a different officer to suggest coercion, that video footage is not in the appellate record. We therefore don't know much about that interaction other than the fact that whatever statements Pinheiro made to that officer were suppressed.

17

¶ 36    But balanced against these factors are those that show no coercive conduct. Namely, Pinheiro was aware of his situation and, from the outset, he specifically and repeatedly asked to speak with a detective. Pinheiro was in a large, open room. Contrary to Pinheiro's assertion, neither the officer nor the detective "loomed" over him or were even particularly close to him. Pinheiro was unrestrained, though he had bags on his hands pending gunshot residue testing. The detective was in plainclothes and unarmed. Pinheiro displayed no physical or mental distress. Indeed, Pinheiro smirked, smiled, and laughed at times during the brief interaction. And though Pinheiro points to the fact that he was not wearing a shirt, he voluntarily removed his shirt outside the police station and reported that to the 911 operator. Most critically, the detective made no threats or promises and didn't engage in trickery. The detective was calm and polite, not threatening, aggressive, or intimidating. Finally, the entire interaction lasted less than five minutes and was not investigatory in nature. Rather, the detective's limited questioning was based on his sincere (but mistaken) belief that there was "still an exigency." The questions

18

were thus limited to finding the victim — not overbearing Pinheiro's will.

¶ 37     We are unpersuaded by Pinheiro's claim that his body language, including a sigh and an eye roll, shows government coercion or that his will was overborne. While the video shows that Pinheiro seemed irritated, the voluntariness inquiry focuses on the conduct of law enforcement and whether that conduct was of such a nature as to overbear the defendant's will. *Effland*, 240 P.3d at 877. Indeed, compared to those cases where police have engaged in coercive tactics, the detective's limited questioning here falls far short. *See Ramadon*, ¶ 28 (concluding statements were coerced after the government invoked "violence" and exploited the defendant's unique vulnerabilities, including fear of deportation and death, to elicit inculpatory statements).

¶ 38     Because the totality of the circumstances does not show coercive conduct or that Pinheiro's will was overborne, we conclude that the district court correctly found that the statements were voluntary. Therefore, the physical evidence obtained from those statements was admissible, even if the statements themselves were not.

## III. Prosecutorial Misconduct

¶ 39     Pinheiro contends that the prosecutor committed misconduct in rebuttal closing argument by arguing that Pinheiro's post-*Miranda* silence was evidence of guilt, and that the district court reversibly erred by allowing the argument. We aren't persuaded.

¶ 40     We apply a two-step analysis to questions of prosecutorial misconduct, considering (1) whether the prosecutor's conduct was improper based on the totality of the circumstances and, if so, (2) whether the conduct warrants reversal under the applicable standard. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 41     Because defense counsel didn't object to the prosecutor's conduct at trial, we review for plain error. *People v. Buckner*, 2022 COA 14, ¶ 43. Under that standard, we will reverse only if the error was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. *Hagos*, ¶ 14.

¶ 42     Pinheiro defended on the theory that the killing was accidental. His counsel pressed this theory in closing argument, telling the jury, "Ladies and gentlemen, the [p]rosecution wants you to believe that every gun accident is somehow a homicide, and

that's just not true.  We all have a right to carry a gun, and we all know that accidents do happen."

¶ 43    In rebuttal argument, the prosecutor addressed the theory of defense and argued that:

- "[Pinheiro] chose to confess to this crime.  There was never a mention of anything happening other than him saying, I shot somebody.  There was no evidence of an accident, no evidence of unintentional discharge of a weapon, none of that, just simply: I shot him."

- "There would be an explanation of what happened if it were a tragedy, right?  No.  That's not what you hear, not what you see in the body-worn camera from [the responding police officer]."

- "[Pinheiro] showed no remorse.  He did nothing to help.  Rather, he walked to the Sheridan police station, called 911, confessed his murder.  The police came.  He never said anything different."

¶ 44    Pinheiro now contends that these statements improperly commented on his post-arrest silence to infer guilt.

¶ 45    But Pinheiro's premise that the referenced statements are post-arrest is wrong.  Pinheiro confessed that he had shot and killed someone to the 911 operator.  That confession was pre-arrest and before Pinheiro was Mirandized.  Pinheiro doesn't argue that the prosecution's comments on his pre-arrest silence were improper.  *See Coke*, ¶ 7 (explaining that, when a defendant is not in custody, there is no "conceivable basis by which the Fifth Amendment privilege against self-incrimination could have attached," and, therefore, a defendant has no Fifth Amendment privilege to assert).  In any event, the prosecution's comments centered on the content of Pinheiro's statements, not his silence. *See People v. Rogers*, 68 P.3d 486, 492 (Colo. App. 2002) ("A defendant cannot have it both ways.  If he talks, what he says or omits is to be judged on its merits or demerits . . . .") (citation omitted).  Because Pinheiro elected to speak, we conclude that the prosecutor did not commit misconduct by commenting on what Pinheiro said to the 911 operator, including what he omitted.

¶ 46    To the extent Pinheiro contends that the prosecutor committed misconduct by commenting on Pinheiro's demeanor or demonstrated lack of remorse, we disagree.  The jury heard the 911

22

call and saw the video of Pinheiro's arrest. It's not improper to comment on the evidence and reasonable inferences to be drawn from the evidence. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). And insofar as Pinheiro contends that the prosecutor committed misconduct by commenting on the lack of evidence showing an accidental or unintentional shooting, that, too, is proper argument. *See People v. Esquivel-Alaniz*, 985 P.2d 22, 23 (Colo. App. 1999).

¶ 47    Finally, even assuming any of the rebuttal argument could be construed as a reference to post-arrest statements, we cannot conclude that the brief comments were so obviously improper that the district court should have sua sponte intervened "without the benefit of an objection." *Cardman v. People*, 2019 CO 73, ¶ 34 (citation omitted).

¶ 48    We therefore disagree that the prosecutor committed misconduct or that the district court erred by allowing the rebuttal argument.

IV.    Theory of Defense Instruction

¶ 49    For his theory of defense, Pinheiro asked the court to instruct the jury as follows:

> The defense contends that [Pinheiro] is not guilty of first-degree murder. On July 29th, 2017, [the victim] was downstairs in the basement drinking beer. [Pinheiro] was showing [the victim] the gun when the gun accidentally fired. [Pinheiro] did not act after deliberation or with intent. After the shooting, [Pinheiro] immediately left the house and went to the Sheridan Police Department to report the shooting. [Pinheiro] is not guilty of the lesser included offense of second degree murder. As this was an accident, [Pinheiro] did not act with the required mental state of knowingly.

¶ 50    The court rejected this instruction, finding, among other things, that "nothing in the record . . . supports that [Pinheiro] was showing [the victim] the gun or that the gun was accidentally fired."

¶ 51    Ultimately, after working with defense counsel on a modified instruction, the court instructed the jury, in relevant part, as follows:

> The defense contends that [Pinheiro] is not guilty of the lesser included offense of second degree murder. On July 29th, 2017, [the victim] had consumed alcohol. There were no marks on [the victim's] body that indicated he had been in a physical altercation. The defense contends that there is no evidence that [Pinheiro] acted knowingly. After the shooting, [Pinheiro] immediately left the house and went to the Sheridan Police Department to report the shooting.

¶ 52    Pinheiro maintains that the district court reversibly erred by modifying his theory of defense instruction.

¶ 53    "[A]n instruction embodying a defendant's theory of the case *must be given* by the [district] court if the record contains any evidence to support the theory." *People v. Nunez*, 841 P.2d 261, 264 (Colo. 1992).  But the court may reject a theory of defense instruction that is "argumentative, contains errors of law, merely reiterates portions of the evidence, or is encompassed within the other instructions." *People v. Martinez*, 2020 COA 141, ¶ 82 (quoting *People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000)).  If the court refuses to give a defense theory of the case instruction, it has an affirmative obligation to cooperate with counsel to either correct the tendered theory of defense instruction or to incorporate the defense theory in a court-drafted instruction.  *Nunez*, 841 P.2d at 265.  The court isn't required, however, to instruct the jury on the defense theory by using the language tendered by the defendant. *People v. Merklin*, 80 P.3d 921, 927 (Colo. App. 2003).

¶ 54    We review the decision to modify a tendered theory of defense instruction for an abuse of discretion.  *Martinez*, ¶ 79.

¶ 55    The district court correctly refused the tendered instruction because no evidence was presented that the shooting was accidental. *See People v. Griego*, 517 P.2d 460, 461 (Colo. 1973) ("[T]he [district] court correctly refused the tendered instruction as there was no evidence in the record to support [the] defendant's theory of the case."). While Pinheiro points to evidence (and the absence of evidence) that he claims supports his accidental shooting theory, none of the cited evidence or lack of evidence says anything about whether the shooting was accidental or knowing. While defense counsel was free to — and did — argue that the shooting was accidental, he wasn't entitled to a jury instruction that lacked record support. *See id.*; s*ee also Lee*, 30 P.3d at 690 (holding the district court did not err by rejecting the defendant's "accidental shooting" theory of defense instruction because the theory was conveyed by other instructions and closing arguments).

¶ 56    And the court fulfilled its duty to work with counsel to craft an appropriate alternative theory of defense instruction. Based on the evidence presented, the court added "There were no marks on [the victim's] body that indicated he had been in a physical altercation." That, together with the language that "there was no evidence that

26

[Pinheiro] acted knowingly," as well as defense counsel's closing argument that the shooting was accidental, sufficiently conveyed Pinheiro's theory of defense. *See People v. Trujillo*, 2018 COA 12, ¶ 14 ("In considering whether a jury was adequately informed of a defendant's theory of the case, a reviewing court can take into account whether defense counsel's closing argument 'fairly represented' the theory to the jury.") (citation omitted).

¶ 57     We therefore conclude that the court did not abuse its discretion by giving the modified theory of defense instruction.

## V.     Cumulative Error

¶ 58     Pinheiro contends that collectively the district court's errors violated his right to a fair trial, entitling him to a new one. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24. But cumulative error requires multiple errors resulting in cumulative prejudice. *Id.* at ¶ 25. Because we have identified only a single harmless error and assumed a possible nonprejudicial error, cumulative error doesn't apply.

## VI.    The Sentence

¶ 59     Pinheiro says he must be resentenced because the district court violated his right to speak at the sentencing hearing and

because the court failed to state the "basic reasons" for imposing the maximum forty-eight-year sentence. Alternatively, Pinheiro argues that the cumulative effect of these sentencing errors requires resentencing. Because we agree that the court violated Pinheiro's right to speak, we don't reach the remaining arguments.

¶ 60 The district court must give every criminal defendant an opportunity to speak on their own behalf before it imposes a sentence. § 16-11-102(5), C.R.S. 2024; Crim. P. 32(b)(1). To afford a defendant this opportunity, the "court must address the defendant in a manner that leaves no doubt that the defendant is personally invited to speak" before sentencing. *People v. Marquantte*, 923 P.2d 180, 186 (Colo. App. 1995); *see also Green v. United States*, 365 U.S. 301, 305 (1961) (noting that district courts should "unambiguously address themselves to the defendant" before sentencing).

¶ 61 At sentencing, defense counsel stated that he "instructed" Pinheiro "not to make a statement today" and that he planned on appealing the conviction. Defense counsel, however, did not state that he had advised Pinheiro of his right to speak before sentencing. And after defense counsel spoke, the court immediately sentenced

28

Pinheiro without addressing Pinheiro directly or confirming whether Pinheiro understood that he had a right to speak and, if so, whether he wanted to exercise that right before sentencing.

¶ 62 Because nothing in the brief sentencing record shows that Pinheiro was aware that he had the right to speak at sentencing, and because the court didn't clarify that point or invite him to speak, we cannot agree with the People that Pinheiro "was clearly aware of his right to speak" or "was given the opportunity to speak" and "chose not to."

¶ 63 While the People argue that any error was harmless, they also acknowledge that the required remedy is resentencing. *People v. Borrego*, 774 P.2d 854, 856 (Colo. 1989) ("We have consistently held that the defendant has the right to allocution before sentence is imposed and that denial of the right of allocution requires resentencing."). We therefore reverse the sentence and remand for resentencing.

## VII. The Mittimus

¶ 64 Though not raised by the parties, the mittimus incorrectly states that Pinheiro "pled guilty" to second degree murder. Because a clerical mistake may be corrected at any time, Crim. P. 36, on

29

remand the district court should correct the mittimus to reflect that Pinheiro did not plead guilty.

## VIII. Disposition

¶ 65 The judgment of conviction is affirmed, the sentence is reversed, and the case is remanded for resentencing and correction of the mittimus.

JUDGE BROWN and JUDGE SCHOCK concur.